No. 2--06--0507      Filed: 1-28-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| RICHARD GEHRETT and DENISE GEHRETT, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 98--L--754 |
| CHRYSLER CORPORATION, CHRYSLER FINANCIAL CORPORATION, and AUTHORIZED AUTO RECOVERY, INC., | ) ) ) ) | |
| Defendants | ) ) | |
| (Naperville Jeep/Eagle, Inc., Defendant-Appellant). | ) ) ) | Honorable Terence M. Sheen, Judge, Presiding. |

JUSTICE ZENOFF delivered the opinion of the court:

Defendant, Naperville Jeep/Eagle, Inc. (or dealership), appeals from a judgment entered in favor of plaintiffs, Richard and Denise Gehrett, and against the dealership by the circuit court of Du Page County following a jury trial on January 27, 2005. Defendant also appeals from a judgment entered in favor of plaintiffs and against the dealership by the trial court sitting without a jury as to count V of plaintiffs' seventh amended complaint (violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Act) (815 ILCS 505/1 et seq. (West Supp. 1997)) on February 2, 2005. The trial court heard the evidence regarding count V simultaneously with the jury trial. For

the reasons that follow, we affirm as modified and remand to the circuit court for further proceedings.

BACKGROUND

Defendant is a Jeep/Eagle dealership located at 3300 Ogden Avenue in Lisle, Illinois. A dispute between plaintiffs and defendant arose in June 1997 regarding plaintiffs' lease of a 1997 Jeep Grand Cherokee Laredo from defendant. The vehicle defendant leased to plaintiffs was not equipped with a Quadra-Trac on-demand-four-wheel-drive system, although the transmission indicator plate located next to the gear shift lever inside the vehicle stated it was so equipped. In January 2005, the parties proceeded to trial on plaintiffs' sixth amended complaint, which alleged breach of written warranty (count I), breach of express warranty (count II), breach of implied warranty of merchantability (count III), revocation of acceptance (count IV), violation of the Act (count V), and common-law fraud (count VI). The remaining counts of the sixth amended complaint alleged breaches by certain defendants that are not part of this appeal.

During trial, plaintiffs filed their seventh amended complaint. The seventh amended complaint alleged breach of written warranty (count I), breach of express warranty (count II), breach of implied warranty of merchantability (count III), revocation of acceptance (count IV), violation of the Act (count V), and common-law fraud (count VI). The remainder of the seventh amended complaint was directed against the defendants that are not part of this appeal. The only counts submitted to the jury were the breach of warranty and common-law fraud counts. For a reason not explained in the record, the breach of warranty count was submitted to the jury as count I, and the common-law fraud

count was submitted as count II. The trial court was the trier of fact on count V. At trial, plaintiffs and defendant entered into the following stipulation:[1]

"(1) That the [d]efendants warranted the 1997 Jeep was equipped with a Quadra-Trac 4-wheel drive.

(2) That the 1997 Jeep was delivered to [plaintiffs] without a Quadra-Trac 4-wheel drive.

(3) That [Chrysler] and [defendant] have breached the warranty as to the 1997 Jeep.

(4) That [p]laintiffs gave written notice of the breach to [Chrysler] and [defendant] on February 5, 1998, and this notice of breach was proper and timely under the law.

(5) [Plaintiffs] and [defendant] have further stipulated that the damages to be assessed in favor of [p]laintiffs, and against [defendant], for breach of warranty include the amounts paid by [plaintiffs] at the time the lease was signed, in the amount of $2,058 and subsequently 13 monthly payments of $497.69 each, totaling $6,469.97, for a total of $8,527.97.

(6) It is for the jury to determine whether [p]laintiffs are also entitled to an award of damages for aggravation and inconvenience, in addition.

(7) The parties have also stipulated that [p]laintiffs have returned the vehicle to Chrysler, and this took place in 1998.

(8) The [d]efendants have also stipulated that they are financially able to pay any punitive damages that may be awarded."

Testimony at trial showed the following. Plaintiffs leased a 1994 Jeep Grand Cherokee Laredo from defendant. It was equipped with a Quadra-Trac, full-time, four-wheel-drive system that

---

[1]The stipulation also included Chrysler Corporation, which is not a party to this appeal.

required no driver input. Plaintiffs had researched the Quadra-Trac system before leasing the 1994 Jeep. In June 1997, plaintiff Richard Gehrett received a call from Michael "Lefty" Biondini, who, according to Richard, introduced himself as a sales manager for defendant. Biondini informed Richard that the lease on the 1994 Jeep was coming to an end. He invited Richard to come to the dealership to talk to him about "buying out" the 1994 Jeep or purchasing or leasing a new 1997 Jeep. According to Richard, Biondini told him in this conversation that plaintiffs had a "tremendous amount" of equity in the 1994 Jeep that could be applied to the buyout of the 1994 Jeep or to the purchase or lease of a new 1997 model. Richard made an appointment with Biondini for June 25, 1997, at 5 p.m.

Plaintiffs arrived at the dealership about 4 p.m. on that date. Denise testified that Biondini was busy. She and Richard were approached outside the dealership by another salesman, later identified as Storto, who showed them some vehicles on the lot. Plaintiffs then followed Storto inside the dealership and into an office. Denise wanted to keep the 1994 Jeep, and she asked Storto about the buyout Biondini had mentioned to Richard. According to Denise, Storto told her she had no equity in the 1994 Jeep and that a buyout would be "very costly." Denise testified that Storto asked her what was important "in the way of a car" and whether plaintiffs would consider another Jeep. Denise said she would "definitely" consider another Jeep, but it had to have the same options as the 1994 Jeep, including Quadra-Trac. She testified that Storto checked a computer and then told her the dealership had no Quadra-Tracs, that such a vehicle would be a special order.

According to Denise, plaintiffs then went back outside to wait for Biondini because they wanted to talk to him about the buyout on the 1994 Jeep. At 7 p.m. Biondini became available to talk to plaintiffs. According to Denise, he introduced himself as a sales manager. Denise testified that

Biondini told them they had no equity in the 1994 Jeep and they should lease a new one. Either Denise or Richard told Biondini that Storto had informed them the dealership did not have a Jeep with Quadra-Trac in stock. Biondini said he was sure he had one and he would "go find it." Denise testified that she would not have agreed to lease another vehicle from defendant if it did not have Quadra-Trac. She testified that this would be a "deal breaker." Biondini was gone for about 30 to 45 minutes. Denise testified that Biondini then pulled up to the front of the dealership in the 1997 Jeep they eventually leased. She testified that Biondini jumped out of the vehicle and said "he found it." He asked Denise to get into the driver's seat, and he showed her the "indicator which indicated it was a Quadra-Trac." She testified that this indicator, or emblem, was a plastic part that appeared to snap in and out. According to photos in evidence, this part is located to the left of the gear shift lever. According to Denise, at the bottom of the emblem were the words "Quadra-Trac" and a Chrysler symbol. She testified that she saw other Jeeps on the lot with similar emblems that appeared to snap in and out but were labeled "Selec-Trac." She knew that Selec-Trac was a less expensive option than Quadra-Trac that was not full-time four-wheel drive but had to be manually operated. Denise testified that plaintiffs leased the 1997 Jeep that evening, based upon Biondini's representation that it was equipped with Quadra-Trac. Plaintiffs did not test-drive the vehicle before signing the lease, and Denise did not see a window sticker on it before signing the lease.

Denise testified that primarily she drove the 1997 Jeep. She noticed that it hydroplaned. On Christmas Eve, Richard was driving when the Jeep slid off the driveway and got stuck in snow. In another incident a little bit later, Denise was picking up her youngest son at school, and Richard was there also. According to Denise, Richard noticed that the wheels on the 1997 Jeep were not turning at the same time. Richard commented that the transmission was not engaged. Denise took the

vehicle to defendant's service manager. She told him that there was something wrong with the Quadra-Trac, that only two wheels, instead of all four, were engaging. After inspecting the vehicle, the service manager informed Denise that there was nothing wrong, that the 1997 Jeep was a Selec-Trac and not a Quadra-Trac. The manager further informed Denise that the 1997 Jeep had "a wrong indicator plate on it."

Denise testified she told the service manager she did not want the Selec-Trac and she asked what defendant was "going to do about this." According to Denise, the service manager said he had ordered the correct indicator plate, and there was nothing further to be done. When Denise asked to speak with Biondini, the service manager told her that Biondini no longer worked for defendant. Denise then asked to speak with defendant's manager. The service manager replied that he had already spoken to the dealership's manager and that the "matter was taken care of." According to Denise, the service manager told her that if she still had a problem, she should call her lawyer.

Richard testified about plaintiffs' visit to defendant on June 25, 1997. A salesman whose name Richard did not recall told them Biondini was not available. Richard mentioned to the salesman Biondini's statement that they had equity in the 1994 Jeep. The salesman replied, "that wasn't going to be a possibility." Richard then expressed interest in a 1997 Jeep with Quadra-Trac and certain other options. Richard testified he and Denise went into an office with the salesman, where the salesman "started looking through I believe a computer at that time and some paperwork and so on and so forth." The salesman informed plaintiffs he did not have a Jeep with Quadra-Trac on the lot. Richard testified that he said he would not lease a vehicle without Quadra-Trac. According to Richard, plaintiffs then waited approximately two hours to speak with Biondini.

Biondini, who represented himself to customers as a floor manager, told Richard he must have misunderstood their telephone conversation, because it was not possible to realize any equity in the 1994 Jeep. Richard testified he told Biondini plaintiffs wanted a like vehicle with Quadra-Trac and he asked Biondini to call other dealerships to locate one. According to Richard, Biondini "took off for a while," and, when he returned, he told plaintiffs, "[W]e got the vehicle for you. Found one." Biondini pointed at the plate on the "shifter" and said, "See. We found a Quadra-Trac for you." At that point, plaintiffs agreed to lease the 1997 Jeep. Richard testified he would not have signed the lease agreement if he had known the 1997 Jeep did not have Quadra-Trac. Richard then testified to the problems plaintiffs had getting stuck in the snow. He stated that all the problems with the vehicle caused him to become upset and aggravated.

Biondini testified he was a floor manager for defendant in 1996, 1997, and 1998. He stated his right arm was paralyzed and in a sling. Biondini recalled that Richard specifically wanted a Jeep with Quadra-Trac and that he had to "search the lot for it." Biondini testified that he did not have access to computers and that the only way he could tell if a particular vehicle was equipped with Quadra-Trac was to look inside the vehicle at the "shifter." He also stated he would not consult the window sticker to determine whether a vehicle was a Quadra-Trac. He stated he routinely determined a vehicle's options by visual examination rather than consulting paperwork. According to Biondini, the vehicle he presented to plaintiffs did have Quadra-Trac. Biondini denied that anyone had told him otherwise. He further denied that he switched indicators on the transmission lever to deceive plaintiffs into leasing the 1997 Jeep.

Samuel Guzzino was defendant's general manager in June 1997. He testified that Biondini was a salesman, not a floor manager. According to Guzzino, the salesmen did not have access to

computers at the time plaintiffs leased the 1997 Jeep, and defendant did not keep any spare transmission indicator plates on hand. Guzzino testified that a new vehicle arrives at defendant's premises from Chrysler with a window sticker that details all the options on the vehicle and that an invoice with that information is also available to the customer, if the customer asks to see it.

On January 27, 2005, the jury returned a verdict in favor of plaintiffs and against defendant. The jury assessed actual damages in the sum of $8,527.97. The jury assessed damages for aggravation and inconvenience in the amount of $15,750 and punitive damages of $88,168.50. On February 2, 2005, the trial court entered a verdict in favor of plaintiffs and against defendant on count V (consumer fraud) of the seventh amended complaint. On February 14, 2005, plaintiffs filed a petition for an award of costs and attorney fees. On October 17, 2005, the trial court allowed the petition and awarded plaintiffs the costs of filing the complaint and jury demand, servicing defendant, and filing a second appeal (involving an entity that is not a party to this appeal). In addition, the trial court awarded plaintiffs attorney fees in the amount of $53,087.50. On November 15, 2005, defendant filed a posttrial motion, which the trial court denied on April 25, 2006. The trial court gave plaintiffs leave to file a supplemental fee petition, and the trial court awarded supplemental fees of $4,400 on May 6, 2006. Defendant filed a timely notice of appeal.

ANALYSIS

A. Plaintiffs' Motion to Strike Defendant's Reply Brief

On December 7, 2006, plaintiffs filed a motion to strike defendant's reply brief on the grounds that it contains in footnotes facts de hors the record and is not confined strictly to replying to arguments in the appellee's brief. We ordered the motion taken with the case, and we will address the motion now. Supreme Court Rule 341(j) (210 Ill. 2d R. 341(j)) provides, "The reply brief, if any,

shall be confined strictly to replying to arguments presented in the brief of the appellee and need contain only Argument." Plaintiffs do not point out how in particular defendant's reply brief violates this rule, and a violation is not apparent to us in reading the reply brief. However, defendant's reply brief contains two footnotes that make factual assertions with no citations to the record. Moreover, it is clear that the facts contained in the footnotes are de hors the record. While this is improper, rather than employ the harsh sanction of striking the reply brief, we have disregarded any improper information, and our disposition of the case on the merits is based entirely on information contained in the record. See Tekansky v. Pearson, 263 Ill. App. 3d 759, 763 (1994).

B. Whether the Jury's Verdict On the Common-Law Fraud Count Was Against the Manifest

Weight of the Evidence

We turn now to the merits of the appeal. Defendant's first contention is that the jury's verdict in favor of plaintiffs on the count of common-law fraud (count II as submitted to the jury) is against the manifest weight of the evidence.[2] Defendant maintains the evidence does not support a finding that defendant knew its representation was false or that it acted in reckless disregard of the truth. A reviewing court "will not set aside a jury verdict unless the verdict is determined to be contrary to the manifest weight of the evidence." Hawkes v. Casino Queen, Inc., 336 Ill. App. 3d 994, 1010 (2003). " 'A verdict is against the manifest weight of the evidence if the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary[,] and not based upon any of the evidence.' " Hawkes, 336 Ill. App. 3d at 1010, quoting Carter v. Azaran, 332 Ill. App. 3d 948, 959 (2002). The jury's verdict should be upheld if there is sufficient credible evidence to support it.

---

[2]This argument assumes that the verdict was for common-law fraud rather than breach of warranty, an issue we address later.

Hawkes, 336 Ill. App. 3d at 1010. The appellate court "will not disturb a jury verdict unless there is no evidence that fairly tends to support the verdict." Hawkes, 336 Ill. App. 3d at 1011. "[The] jury's verdict is entitled to respect and deference, and [we] will not invade the function of the jury and substitute [our] judgment for the jury's." Hawkes, 336 Ill. App. 3d at 1011.

We first examine defendant's claim that plaintiffs failed to present clear and convincing evidence that it knew that the 1997 Jeep it leased to plaintiffs was not equipped with the Quadra-Trac four-wheel-drive system. "The elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." Connick v. Suzuki Motor Co., 174 Ill. 2d 482, 496 (1996). The first element encompasses three requirements: (1) the defendant must make a misrepresentation; (2) the misrepresentation must involve a fact; and (3) the misrepresentation must be material. Hart v. Boehmer Chevrolet Sales, Inc., 337 Ill. App. 3d 742, 751 (2003). Defendant in our case bases its argument on the testimony of Biondini and Guzzino. Defendant contends that any inference Biondini switched the Selec-Trac indicator plate on the transmission lever in the 1997 Jeep for a Quadra-Trac indicator plate is nothing more than impermissible innuendo, conjecture, and speculation, because it contradicts the "unrebutted" evidence presented by defendant. However, " '[i]t is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony.' [Citation.]" Hawkes, 336 Ill. App. 3d at 1000.

Defendant recognizes that it admitted it misrepresented the type of transmission on the 1997 Jeep, when it stipulated that it warranted the vehicle to have Quadra-Trac four-wheel drive and that

it delivered a vehicle with Selec-Trac. Defendant seeks to undo this admission by claiming, "In hindsight, Naperville Jeep should not have been a party to this stipulation." Defendant does not argue that it was misled into making the admission or that the admission was the product of fraud or duress. Furthermore, Biondini admitted he represented the 1997 Jeep as being equipped with Quadra-Trac, and defendant's service manager admitted to Denise that the vehicle was not a Quadra-Trac. Therefore, there is no basis for defendant to attempt to withdraw the admission at this stage.

Defendant maintains that the jury could not have believed plaintiffs' testimony that an "unidentified" salesman checked through paperwork and the inventory database before advising plaintiffs there was no Quadra-Trac in stock, because Guzzino testified that salesmen did not have access to computers. Guzzino also testified that the salesmen were required to search the lot for vehicles and that defendant did not keep Quadra-Trac indicator plates in stock. Biondini testified that he physically searched the lot to locate vehicles, that he had no access to computers, and that he visually examined the vehicles to determine their options rather than referring to window stickers or other paperwork.

The jury could have reasonably rejected Guzzino's and Biondini's testimony. Biondini misrepresented himself to customers, including plaintiffs, as a manager, when he was actually a salesman. The jury would be justified in looking askance at anything Biondini said. The jury could have determined that Guzzino's testimony denying that the salesmen had access to the computer inventory was inherently incredible as being contrary to common sense. Moreover, the jury could have found Guzzino's testimony, that defendant did not keep a stock of Quadra-Trac indicator plates, not relevant. That testimony was offered to show that Biondini could not have switched the plates. However, plaintiffs surrendered their 1994 leased Jeep with Quadra-Trac to defendant. Biondini had

access to the plate on that vehicle. The indicator plates are plastic parts that snap in and out of place. Defendant suggests that Biondini, with his paralyzed right arm, could not perform that maneuver. However, nothing in the record supports the inference that "Lefty" Biondini was incapable of switching the plates using his good left hand. He testified he searched the lot for the 1997 Jeep and then drove the Jeep to where he presented it to plaintiffs, so he apparently had no trouble driving with one arm. Defendant's assertion that the salesman who initially helped plaintiffs was "unidentified" and, therefore, presumably a phantom, is not supported by the record. The salesman was identified as a Mr. Storto. Defendant argues that plaintiffs did not testify to what Storto looked at on the computer screen or in the paperwork he consulted and, therefore, their testimony in that regard must be disregarded. The jury heard this evidence, and it was within its province to draw the inference that Storto was searching through defendant's inventory of vehicles and did not find a 1997 Jeep with Quadra-Trac.

The evidence showed that plaintiffs were adamant they would accept only a Jeep with the Quadra-Trac four-wheel-drive system. Denise testified that anything else was a "deal breaker." After luring plaintiffs into the dealership by telling them they had equity in the 1994 leased Jeep that could be used to purchase or lease a new Jeep, Biondini retracted that representation. The lease on the 1994 Jeep was about to expire, and plaintiffs desired to lease a new Jeep with the same options, and particularly the Quadra-Trac. They informed Biondini of Storto's statement that defendant did not have a Quadra-Trac on the lot. Biondini assured plaintiffs he had one. Biondini disappeared for a considerable period of time. When he returned, he informed plaintiffs he found a vehicle with Quadra-Trac, and he pointed out specifically the emblem on the indicator plate. This was plaintiffs' only signifier that the transmission was a Quadra-Trac. Denise testified she did not see a window

-12-

sticker. Based on Biondini's representation, plaintiffs entered into the lease without test-driving the vehicle. Guzzino admitted that defendant kept window stickers that detailed options on particular vehicles and that invoices were available with that information if customers asked for it. Yet defendant chose not to introduce into evidence at trial those items pertaining to the 1997 Jeep. The jury could have drawn the inference that the evidence would be unfavorable to defendant. In sum, there is sufficient credible evidence to support the jury's finding that defendant knew the 1997 Jeep it delivered to plaintiffs on June 25, 1997, was not equipped with a Quadra-Trac four-wheel-drive system.

Defendant alternatively argues that plaintiffs failed to provide clear and convincing evidence that defendant recklessly disregarded the misplating of the 1997 Jeep. Defendant relies on Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 105 L. Ed. 2d 562, 109 S. Ct. 2678 (1989), a libel case against a newspaper, which had nothing to do with fraud. In any event, we believe the record amply supports the claim that defendant acted recklessly. Biondini testified he relied solely on the appearance of the vehicle, rather than on the window sticker or invoice, to determine what options were on the vehicle. If the 1997 Jeep had been misplated elsewhere, and presuming the relevant paperwork showed it was misplated, then Biondini acted in culpable ignorance of the truth when he failed to consult the documentation for the vehicle and nevertheless represented the vehicle as a Quadra-Trac. Accordingly, the evidence of liability supported the jury's verdict for common-law fraud.

C. Whether the Trial Court's Judgment In Favor of Plaintiffs for Consumer Fraud Was Against the Manifest Weight of the Evidence

We next consider defendant's contention that the trial court's judgment in favor of plaintiffs for violation of the Act was against the manifest weight of the evidence. "The elements of a private cause of action for damages based on a violation of the Act are: (1) a deceptive act or practice; (2) intent by the defendant that the plaintiff rely on the deception; (3) the deception occurred in the course of conduct involving trade or commerce; and (4) the plaintiff's injury was proximately caused by the fraud complained of." Rockford Memorial Hospital v. Havrilesko, 368 Ill. App. 3d 115, 121 (2006). Although the plaintiff need not prove that he relied on the deceptive act, he must prove that the deception proximately caused his injury. Connick, 174 Ill. 2d at 502. The same facts recited above with reference to the common-law fraud count are applicable here and will not be repeated.

Defendant claims that, when the trial court awarded plaintiffs actual damages in the same amount as those awarded by the jury on the breach of warranty count, plaintiffs received a double recovery. Defendant further claims that if the jury also awarded actual damages on the common-law fraud count, plaintiffs actually recovered the same amount three times. Although a plaintiff may plead and prove multiple causes of action, there may be only one recovery for an injury. Catania v. Local 4250/5050, 359 Ill. App. 3d 718, 728 (2005).

For the moment, defendant leaves aside, for reasons discussed in the next section of the opinion, the possibility that the jury awarded actual damages on the common-law fraud count and posits that we must vacate the duplicative award of actual damages on the consumer fraud count, which, defendant argues, would then vacate the award of attorney fees. This would be unjust to plaintiffs. The law allows a plaintiff to pursue as many causes of action as the facts and good-faith pleading permit. In this opinion, we determine that the trial court's judgment in favor of plaintiffs on the consumer fraud count should be upheld. Therefore, plaintiffs are entitled to recover fees. The

same rationale is true of the common-law fraud verdict. Assuming the jury awarded actual damages of $8,527.95 for common-law fraud, plaintiffs are entitled to recover punitive damages. Consequently, we decline to vacate any of the judgments. However, it is unjust to defendant to allow plaintiffs to recover actual damages on three alternative theories of liability, where there is only one injury. Dowd & Dowd, Ltd. v. Gleason, 181 Ill. 2d 460, 486 (1998). Accordingly, pursuant to our authority under Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 366(a)(5)), we reduce the actual damages plaintiffs can recover to $8,527.97. On remand, the trial court is instructed to enter an order reflecting the reduction of actual damages to this amount.

Defendant asserts that plaintiffs' claim under the Act is based solely on the stipulated misrepresentation of the vehicle, which, according to defendant, is simply a breach of contract that will not support a finding of liability under the Act. Defendant relies on Zankle v. Queen Anne Landscaping, 311 Ill. App. 3d 308 (2000). In Zankle, the appellate court affirmed the trial court's dismissal of a consumer fraud complaint, where the allegations amounted only to the defendant's failure to fulfill its contractual obligations. Zankle, 311 Ill. App. 3d at 312. Zankle is inapplicable to our case. Count V of plaintiffs' seventh amended complaint alleged that defendant misrepresented that the 1997 Jeep was a Quadra-Trac, and, as part of defendant's scheme to defraud, defendant removed the window sticker from the vehicle, or failed to maintain the sticker on the window, so as to deceive plaintiffs about the true options on the vehicle and the true manufacturer's retail price. At trial, plaintiffs presented evidence of the lack of a window sticker and the presence of the Quadra-Trac indicator plate on the 1997 Jeep, when plaintiffs had been informed defendant had no Quadra-Tracs on the lot. Thus, the evidence established a deceptive act and not merely a breach of contract. Consequently, we reject defendant's argument. We cannot say that the trial court's judgment as to

liability was against the manifest weight of the evidence. Accordingly, we affirm the judgment as to liability on count V.

### D. Whether Defendant Is Entitled To A New Trial On Damages

Defendant's next contentions are grouped around the jury's award of actual and punitive damages. Defendant argues that (1) the jury awarded no actual damages for common-law fraud and punitive damages were, therefore, improper; (2) the jury's award of punitive damages was against the manifest weight of the evidence; (3) the trial court abused its discretion by failing to make a finding that plaintiffs established a prima facie case for the recovery of punitive damages; and (4) the trial court abused its discretion in denying defendant's motion for a remittitur on the punitive damages award.

### 1. Whether Verdict Form A Awarded Actual Damages For Common-Law Fraud

Initially, defendant argues that the verdict does not support a finding that the jury awarded actual damages pursuant to the common-law fraud claim. If the jury did not award actual damages, defendant reasons, it could not award punitive damages. According to defendant, the stipulation that actual damages were $8,527.97 was entered on the breach of warranty count, not the common-law fraud count. Therefore, defendant concludes that the jury awarded no actual damages for common-law fraud.

This issue raises the question of the sufficiency of the general verdict in this case. "The validity of a general verdict is tested by whether it expresses the intent of the jury so that the trial court can understand it and enter judgment thereon." In re Estate of Payton, 79 Ill. App. 3d 732, 739 (1979). Here, the trial court submitted two separate theories of liability to the jury, breach of warranty and common-law fraud. The parties stipulated that $8,527.97 was the amount of damages on the breach

of warranty count. The trial court instructed the jury that this amount represented damages for breach of warranty. The trial court did not similarly instruct the jury with respect to the fraud count. Instead, the trial court instructed the jury that it was to determine whether plaintiffs suffered damages as a result of their reliance on the misrepresentation and that defendant denied that plaintiffs were damaged.

The jury was instructed to return Verdict Form A if it found in favor of plaintiffs and against defendant on any count. Verdict Form A provided three lines:

"We assess actual damages in the sum of $8,527.97.

We assess aggravation and inconvenience in the amount of $ _____.

We award punitive damages in the sum of $ _____."

The figure $8,527.97 was preprinted on the form. The jury filled in the line for aggravation and inconvenience with the sum of $15,750, and the line for punitive damages with the sum of $88,168.50. Defendant asserts that the jury awarded actual damages for breach of warranty, a count upon which it could not legally assess punitive damages, because the preprinted amount of damages was the damages stipulated to for breach of warranty, and the award for aggravation and inconvenience was based on an instruction that the jury could find additional damages for breach of warranty.

It is not clear to us that this is the only conclusion to be drawn. The jury was instructed to use Verdict Form A if it found for plaintiffs on any count. Thus, the fact that the jury returned Verdict Form A indicates that it found in plaintiffs' favor on the common-law fraud count. Conversely, the jury was also instructed that, if it found in favor of defendant on the common-law fraud count, it was to return Verdict Form B. It did not return Verdict Form B, which supports the conclusion that it found in plaintiffs' favor on the common-law fraud count. Moreover, because the jury was instructed that punitive damages applied only to common-law fraud, its award of punitive damages further supports

-17-

the conclusion that it found in favor of plaintiffs on that count. We are not long detained by defendant's assertion that the sum of $8,527.97, preprinted on Verdict Form A, represented damages only for breach of warranty, because defendant, in its opening brief, in its reply brief, and at oral argument, conceded that plaintiffs' actual damages on all counts were $8,527.97. Thus, there is evidence in the record both to support and to invalidate the verdict.

However, we need not resolve this issue. Defendant did not object to Verdict Form A or tender a remedial form or a special interrogatory. "On appeal, a litigant waives the right to object to instructions or verdict forms that are given to a jury when the party fails to make a specific objection during the jury instruction conference or when the form is read to the jury." Compton v. Ubilluz, 353 Ill. App. 3d 863, 869 (2004). "Even if the litigant properly objects to an instruction or verdict form, [he] must still submit a remedial instruction or verdict form to the trial court." Compton, 353 Ill. App. 3d at 869. Accordingly, we find that defendant waived this issue.

At oral argument, defendant urged us to consider this issue despite its waiver in furtherance of this court's responsibility to provide a just result and to maintain a sound and uniform body of precedent pursuant to the holding in Dillon v. Evanston Hospital, 199 Ill. 2d 483, 505 (2002). We note defendant did not cite Dillon in its briefs, nor did it seek leave to cite additional authority at oral argument. However, plaintiffs did not object, and we distinguish Dillon from the present case. Defendant argued that the instructions in this case, taken as a whole, were so confusing that they misled the jury. While we agree that Verdict Form A, the only instruction raised by defendant, is not a model of clarity, we determine that this is not a proper case in which to override considerations of waiver. In Dillon, our supreme court recognized a new element of damages, the increased risk of future injury. Dillon, 199 Ill. 2d at 503. Because there was no pattern instruction on this element and

-18-

the instruction given to the jury was inadequate, the supreme court ordered a retrial. Dillon, 199 Ill. 2d at 508. Such a situation is not present in our case. Here, defendant simply did not object to Verdict Form A, tender its own verdict form, or tender a special interrogatory, even though it had the opportunity to do so.

  2. Whether the Award of Punitive Damages Was Against the Manifest Weight of the Evidence

Defendant contends that, while it stipulated it misrepresented the 1997 Jeep as having the Quadra-Trac transmission system, the misrepresentation was made without any malicious or evil intent. Defendant argues the evidence showed that the misrepresentation was simply a mistake. "[P]unitive damages may be awarded where the wrongful act committed by the defendant 'is characterized by wantonness, malice, oppression or other circumstances of aggravation.' [Citation]." Los Amigos Supermarket, Inc. v. Metropolitan Bank & Trust Co., 306 Ill. App. 3d 115, 129 (1999). Punitive damages are proper in a fraud action where the false representations are wantonly and designedly made. Los Amigos, 306 Ill. App. 3d at 130. We review the jury's assessment of punitive damages on a manifest-weight-of-the-evidence standard. Franz v. Calaco Development Corp., 352 Ill. App. 3d 1129, 1145 (2004).

In our case, the jury heard the evidence and determined that punitive damages were warranted. This determination was not against the manifest weight of the evidence. The jury could have believed that Storto told plaintiffs the truth when he informed them defendant had no Quadra-Trac vehicles on the lot and that Biondini intentionally falsified the appearance of the 1997 Jeep he leased to plaintiffs. Alternatively, the jury could have reasonably believed that Biondini was guilty of gross negligence that showed a wanton disregard for plaintiffs' rights when he failed to look at the paperwork that

accompanied the 1997 Jeep to verify it was equipped with Quadra-Trac. Accordingly, the jury's award of punitive damages was not against the manifest weight of the evidence.

 3.  Whether the Trial Court Abused Its Discretion by Failing to Make a Finding That the Evidence

Established a Prima Facie Case for Punitive Damages

Defendant argues that the trial court abused its discretion by failing to make a finding that plaintiffs established a prima facie case for the recovery of punitive damages. Once a trial court determines that punitive damages are, as a matter of law, appropriate to the cause of action, the trial court's decision to submit the issue to the jury will not be reversed absent an abuse of discretion. Franz, 352 Ill. App. 3d at 1138. The record does not disclose that the trial court held a separate hearing at which it made a specific finding that punitive damages were appropriate. However, the trial court submitted to the jury the punitive damages instruction and the verdict form with a line for punitive damages. Implicit in the decision to instruct the jury on the issue of punitive damages was the trial court's determination that plaintiffs had established a prima facie case for such damages. Franz, 352 Ill. App. 3d at 1138 ("[T]he trial court may submit the issue of punitive damages to the jury only if the plaintiff has made out a prima facie case for such damages"). Defendant has provided no authority for its position that the trial court needed to make an explicit finding on the record. The decision whether to instruct the jury on punitive damages was made by the trial court, and the decision whether to award punitive damages was made by the jury. This was appropriate. Knecht v. Radiac Abrasives, Inc., 219 Ill. App. 3d 979, 983-84 (1991).

 4.  Whether the Trial Court Abused Its Discretion When It Denied Defendant's Motion for a

Remittitur of the Punitive Damages

Defendant's contention that the trial court should have granted a remittitur of the punitive damages award is, in essence, the same as a contention that the amount of punitive damages was excessive. Franz, 352 Ill. App. 3d at 1145. Because defendant waived its argument that the jury failed to award actual damages for common-law fraud, we consider $8,527.97 to be the amount of actual damages upon which the jury based its award of punitive damages. Plaintiffs argue that we must add the sum awarded for aggravation and inconvenience, $15,750, because this sum was awarded as consequential damages for fraud. We disagree. The jury was clearly instructed that it was to consider aggravation and inconvenience in awarding additional damages for breach of warranty, which plaintiffs' counsel acknowledged at oral argument.

In determining whether an award is excessive, Illinois courts look to fact-specific relevant circumstances, including: "(1) the nature and enormity of the wrong; (2) the financial status of the defendant; and (3) the potential liability of the defendant." Franz, 352 Ill. App. 3d at 1143. In this case, Biondini represented to Richard in a telephone call that plaintiffs had a "tremendous" amount of equity in their 1994 leased Jeep that could be applied to the lease of a new Jeep or a "buyout" of the lease. This representation was false. Biondini falsely represented himself as either a sales manager or a floor manager. Defendant knew that plaintiffs would not purchase or lease a new Jeep that did not have Quadra-Trac. Storto looked at defendant's inventory and determined that defendant did not have a Quadra-Trac in stock. The vehicle Biondini located had a Quadra-Trac indicator plate but no window sticker to verify that the vehicle was so equipped. The jury could draw the conclusion that Biondini switched indicator plates and removed the window sticker in order to deceive plaintiffs. On these facts, we cannot say that the jury's award was excessive as a matter of common-law principles,

which require the award to be the product of passion, partiality, or corruption in order to be excessive. Franz, 352 Ill. App. 3d at 1138.

Defendant next asserts that the award violated its due process rights, because there was no evidence that defendant's conduct was "reprehensible" or intended to deceive or trick plaintiffs. Grossly excessive punitive damages are in violation of the due process clause of the fourteenth amendment to the United States Constitution. BMW of North America, Inc. v. Gore, 517 U.S. 559, 562, 134 L. Ed. 2d 809, 818, 116 S. Ct. 1589, 1592 (1996). In reviewing the constitutionality of punitive damage awards, we are to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. Gore, 517 U.S. at 575, 134 L. Ed. 2d at 826, 116 S. Ct. at 1598-99. The most important of the three guideposts is the degree of reprehensibility. Gore, 517 U.S. at 575, 134 L. Ed. 2d at 826, 116 S. Ct. at 1599. Courts determine the degree of reprehensibility by considering whether the harm imposed was physical, as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health and safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit. Gore, 517 U.S. at 576-77, 134 L. Ed. 2d at 827, 134 S. Ct. at 1599. We review de novo the constitutional question of whether a punitive damage award is excessive in violation of due process. International Union of Operating Engineers, Local 150 v. Lowe Excavating Co., 225 Ill. 2d 456, 469 (2006).

Applying the reprehensibility factors in this case, the harm was economic, although defendant's conduct evinced a reckless disregard for plaintiffs' safety. Plaintiffs were deceived into believing the 1997 Jeep was equipped with the Quadra-Trac system, which required no driver input. Therefore, plaintiffs did not realize their vulnerability in icy conditions, and they experienced mishaps. There was no evidence presented of plaintiffs' financial vulnerability. There was no evidence that this was anything but an isolated instance of switching indicator plates, although Biondini made several misrepresentations to plaintiffs. We find that the harm was the result of defendant's deceit and trickery and that, therefore, its conduct can be described as reprehensible. We may make a finding of reprehensibility utilizing only one of the factors. Lowe, 225 Ill. 2d at 483.

We now look at the second guidepost, the disparity between the actual or potential harm suffered by plaintiffs and the punitive damages award. With regard to this guidepost, few awards exceeding single-digit ratios will pass constitutional muster. State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 425, 155 L. Ed. 2d 585, 605-06, 123 S. Ct. 1513, 1524 (2003). However, ratios in the single digits are not binding, as there is no bright-line rule as to whether a punitive damage award is excessive. Campbell, 538 U.S. at 425, 155 L. Ed. 2d at 605, 123 S. Ct. at 1524. In our case, the jury awarded stipulated out-of-pocket damages of $8,527.97. The punitive damages award was $88,168.50, roughly 10 times the amount of compensatory damages. Defendant urges that the ratio is "grossly" excessive and should be reduced to no more than quadruple damages. Low compensatory damages awards may support higher ratios where a particularly egregious act has resulted in a small amount of economic damage or where an injury is difficult to detect and the harm is difficult to determine. Lowe, 225 Ill. 2d at 487. Our supreme court has instructed us that the best

way to determine whether a given ratio is appropriate is to compare it to punitive damages awards in similar cases. Lowe, 225 Ill. App. 3d at 487.

Plaintiffs attempt such a comparison of cases; however, the cases they cite are inapposite. Plaintiffs cite Mathias v. Accor Economy Lodging, Inc., 347 F.3d 672 (7th Cir. 2003), which upheld a punitive damages award of $186,000 where actual damages were only $5,000. That case is dissimilar to ours, as it involved plaintiffs being bitten by bedbugs and damages were difficult to quantify because they were largely emotional. Plaintiffs also rely on Ekl v. Knecht, 223 Ill. App. 3d 234 (1991), Ciampi v. Ogden Chrysler Plymouth, Inc., 262 Ill. App. 3d 94 (1994), and Totz v. Continental Du Page Acura, 236 Ill. App. 3d 891 (1992), for the proposition that proportionality between actual damages and punitive damages is not required. These cases are inapposite because they resolved the issue of the propriety of the amounts of punitive damages under the common law and not pursuant to the constitutional principles in Gore, Campbell, and Lowe. Moreover, Totz was concerned with an amount of attorney fees vis-a-vis actual damages, rather than with a punitive damages award.

Our research has disclosed a recent case from the Arkansas Court of Appeals with facts similar to those in our case. In Jim Ray, Inc. v Williams, No. CA06--789 (June 27, 2007), Williams purchased a Nissan pickup truck from Jim Ray. Williams, slip op. at ___. After he drove the truck from the lot, Williams realized the truck had about 3,000 miles on it and the invoice price was higher than the sticker price. Williams, slip op. at ___. Williams returned the truck and convinced Jim Ray to set the deal aside. Williams, slip op. at ___. Williams then picked out another truck with a sticker price of $29,700. Williams, slip op. at ___. In completing the paperwork, Williams noticed the invoice price was $34,125.87. Williams, slip op. at ___. When Williams pointed out the discrepancy to the finance

manager, the finance manager assured Williams that the higher figure represented points or credits, not dollars. Williams, slip op. at ___. Based on this representation, Williams signed the invoice. Williams, slip op. at ___. Williams also purchased an extended warranty that the finance manager told him he was required to buy. Williams, slip op. at ___. Williams later determined he had actually paid $34,125.87 for the truck and, when he tried to cancel the warranty, Jim Ray never responded. Williams, slip op. at ___. Williams's experts at trial testified that a year-old pickup is not ordinarily sold above the sticker price, that the requirement that the customer purchase an extended warranty on a used vehicle constituted fraud, and that the entire deal with Jim Ray resulted in an unconscionable profit for the dealer. Williams, slip op. at ___. Williams was awarded $4,425.87 in actual damages and $75,000 in punitive damages. Williams, slip op. at ___. Undertaking a de novo review of the amount of the punitive damages award, pursuant to Gore, the Arkansas Court of Appeals remitted the punitive damages to $30,000, which represented a single-digit ratio of seven to one. Williams, slip op. at ___.

The Williams court reasoned that Jim Ray's conduct, even including the fact that the dealership was a recidivist, was not highly reprehensible. Williams, slip op. at ___. The court then observed that it had approved ratios higher than single digits in cases of extreme emotional distress or humiliation, a significant disparity of bargaining power, and a "nightmarish" situation involving an improper arrest. Williams, slip op. at ___. Taking into consideration all three guideposts set forth in Gore, the court determined that a punitive damages award of no more than a single-digit ratio was warranted. Williams, slip op. at ___.

We find Williams instructive. Here, defendant's conduct was reprehensible, but it was not heinous or shocking to the conscience. There was no evidence of recidivism, and the transaction was

at arm's length. We cannot say, based on the evidence, that plaintiffs were sophisticated business persons, although they had prior experience negotiating a vehicle lease. However, defendant's deceit and trickery did show a reckless disregard for plaintiffs' safety, because plaintiffs were unaware the vehicle would not automatically go into four-wheel drive in bad road conditions. Thus, we would place defendant's reprehensibility in the middle to slightly above the middle range. Punitive damages of more than four to one but less than double digits are appropriate. We conclude that an award of punitive damages in the amount of $59,695.79 is constitutional. This amount represents a seven to one ratio. Accordingly, we modify the trial court's judgment, and we remand for a remittitur in the punitive damages judgment against defendant to the amount of $59,695.79. See Turner v. Firstar Bank, 363 Ill. App. 3d 1150, 1166 (2006). The remittitur is conditioned upon plaintiffs' consent. On remand, the trial court shall set a reasonable amount of time for plaintiffs' consent, and, if plaintiffs do not consent, then a new trial on the issue of the amount of punitive damages is proper. Turner, 363 Ill. App. 3d at 1166.

The third guidepost is not applicable, because there are no civil penalties for defendant's conduct.

E. Whether the Trial Court Erred When It Denied Defendant's Motion for Judgment

Notwithstanding the Verdict

Defendant next contends that the trial court erred when it denied defendant's motion for judgment notwithstanding the verdict. Defendant reiterates its argument that the jury did not award actual damages on the common-law fraud count, and it requests that we vacate the finding of liability for common-law fraud or that we reverse and remand for a new trial on the common-law fraud claim. "A motion for judgment notwithstanding the verdict should be granted only when ' "all of the evidence,

when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." ' [Citations.]" Petre v. Cardiovascular Consultants, 373 Ill. App. 3d 929, 938 (2007). "We review a trial court's decision to deny a motion for judgment notwithstanding the verdict de novo." Petre, 373 Ill. App. 3d at 938-39. This argument has no merit because we have determined defendant waived the issue of whether the jury awarded actual damages for fraud. Accordingly, the trial court did not err in denying the motion for judgment notwithstanding the verdict.

    F. Whether the Trial Court Erred When It Denied Defendant's Motion for a New Trial

Defendant next contends that the trial court erred when it denied defendant's motion for a new trial. Defendant incorporates all of its prior arguments. "A motion for a new trial should be granted where the jury's verdict is against the manifest weight of the evidence." Petre, 373 Ill. App. 3d at 939. "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based on any of the evidence." Petre, 373 Ill. App. 3d at 939. Because the decision whether to grant a new trial rests within the trial court's discretion, we will not reverse its ruling absent an abuse of discretion. Petre, 373 Ill. App. 3d at 939. We have already determined that the jury's verdict in this case was not against the manifest weight of the evidence. Accordingly, the trial court did not err in denying defendant's motion for a new trial by jury on the common-law fraud count. Similarly, we have already determined that the trial court's verdict on the consumer fraud count was not against the manifest weight of the evidence. Contrary to defendant's assertion that the trial court could not have concluded, based on the evidence, that defendant's acts were intentional, the trial court could have reasonably disbelieved

Biondini and Guzzino and found plaintiffs credible. Accordingly, the trial court did not err in denying defendant's motion for a new trial as to liability on the consumer fraud count.

G.  Whether the Trial Court Abused Its Discretion in Awarding Attorney Fees

Lastly, defendant contends that the trial court abused its discretion in awarding plaintiffs attorney fees in the amount of $53,087.50. Defendant's first basis is that the trial court's judgment against defendant on count V was improper. We have disposed of that issue in plaintiffs' favor.

Defendant's second basis is that we have previously found, in other cases, plaintiffs' counsel's fee petitions wanting, and the fee petition in this case fails to differentiate between compensable and noncompensable time, fails to provide evidence that counsel's hourly fee is reasonable in light of the services performed, fails to provide evidence of the market rate for Du Page County, fails to identify the timekeeper, fails to include specific facts, fails to show time actually incurred, and contains block billing. Defendant recites this litany without further elaboration or argument or citation to authority. The only cases defendant cites are cases where we supposedly criticized plaintiffs' counsel's billing practices. Defendant urges us to dismiss the instant fee petition "out of hand" to teach counsel to heed our prior admonishments in other, unrelated, cases. At page 33 of its brief, defendant concludes, "The only way that this [c]ourt's previous admonitions *** are to have any binding effect is if plaintiffs' fee petition is dismissed out of hand." Asking this court to punish plaintiffs for their attorney's past alleged transgressions in other cases is meritless. Defendant has cited no authority to allow us to do that, and we decline to do so. Moreover, we determine that defendant has waived the argument relating to the sufficiency of the fee petition in this case by failing to comply with Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)). Defendant has lumped its conclusions about the perceived deficiencies in the fee petition into one sentence in its brief, without supporting them with legal argument or appropriate case

citations. "No amount of steadfastness relieves a party of its obligation to abide by this rule in presenting its arguments on appeal." Novakovic v. Samutin, 354 Ill. App. 3d 660, 667 (2004). Further, we note that defendant has filed an incomplete record. This litigation commenced in 1998. The record defendant submitted on appeal is missing the first three years. Accordingly, we hold that the trial court did not abuse its discretion in awarding plaintiffs $53,087.50 in attorney fees.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed as modified by the remittitur of punitive damages, and the cause is remanded to the trial court with instructions to set a reasonable date for plaintiffs' consent to the remittitur and to grant a new trial on the issue of punitive damages should plaintiffs not consent to the remittitur. The court is also instructed to reduce plaintiffs' actual damages to a total of $8,527.97.

Affirmed as modified; cause remanded.

HUTCHINSON and GROMETER, JJ., concur.